Good morning, Your Honors. Jonathan Kirschbaum, Office of the Federal Defender, District of Nevada, for Mr. Jones. I'd like to reserve three minutes for rebuttal, if I may. Defense counsel advised Mr. Jones to agree to a sentence of life without parole because it meant that he would most likely be released. That was deficient performance. It was a gross mischaracterization of the outcome. Life without parole is just that. Life sentence, no parole. Well, but that was not true at that time. The only point at which you can quarrel is whether it was likely or not. It was certainly possible. It certainly was a real possibility, but even the Nevada Supreme Court described it as rare. It was rare. It is an impossible thing to know. It is impossible to know how a future unknown governor is going to perform a discretionary act of grace. It was simply wrong to tell Mr. Jones that it was most likely that his sentence would be commuted. So which — what sentence in the letter that was written is in error? It's that final sentence where he says, based on all the circumstances here, it is most likely that you will have a life outside of prison someday. That is the erroneous sentence. How about the sentence earlier on where he writes, I have been informed that the average time a man has served on a life without in this state is 15 to 18 years. I'm not asking whether it's accurate to say that he's been informed, but is that an accurate statement, that the average time at that period for a life without was, in fact, 15 to 18 years? Honestly, I don't know the answer to that. But what I will say is that that sentence — And why don't you know the answer to that? Because I think it's unknowable. I mean, even counsel in his letter says that — If it's unknowable, let's assume it's true. We can assume — okay. Even if we assume it's true, that sentence does leap out. I mean, so we hear that he says 15 to 18 years. He gives him this definite time frame of 15 to 18 years. But if we assume that that's true, then what's wrong with the sentence that you quoted? Because it's — at the time, it's fine. You know, it's fine to say that it was 15 to 18 years. But even counsel then takes that back. He says — This is a very, very careful letter, counsel. This is a very responsible letter. I don't know if I would characterize it that way. I think it — some parts of it are responsible. But when you conclude it by saying that you will most likely get out, I don't think that's being responsible. I think that crosses a line. I think that's misleading him to believe that a life without sentence means that it's not a life without sentence. And I don't think that that's — He said it was most likely. He didn't say it was guaranteed. Well, that's true. But he did say it most likely means more likely than not. Right. And it turned out that it was — that he's one of the unfortunate ones who didn't get out. But it doesn't mean you're guaranteed that. Well, I don't know. When you hear that sentence, when you hear the 15 to 18 years, he puts this guarantee in there. 15, 18 years, that's what I've been told. And then at the end, he says that means most likely you're getting out. I don't think that's — I don't think he's in a position to say that. I just don't think that's something that is within the realm of a possible advice that an attorney could give in any situation. Well, you're in a — you, of course, are — have the nice advantage of hindsight. You're able to say to him, well, that — that it turned out that you were — it was — it was not most likely that you would be able to get out. It was less likely than we originally estimated. But that doesn't make it ineffective. But even at the time, we have that Miller case, which, you know, the district court cited, but it's actually helpful to us. Because even the Nevada Supreme Court described the commutation process as rare. It was a 26-over-22-year period. If — if the numbers that counsel had access to, which he even admitted were not the broad spectrum of all numbers, he just said, this is what I have access to. But even on the Nevada Supreme Court, their decision describing the commutation process at the time was not most likely. But even setting that aside, once again, counsel can't make this prediction. The commutation process was within the control of the governor and the parole board? I'm sorry. Say that again. The commutation process was — was within the control of the governor and the parole board? No, governor and the pardons board. So — Right. Okay. But — okay. And the pardons board. But not the — but not the Nevada Supreme Court. Well, that's true, Your Honor. But they were — when the Nevada Supreme Court was describing what the commutation process, how it worked at the time, they said that it was still a rare avenue of relief. So — They would have to base that on some statistics. Right. And they did. And they — That they would — might have had to have been informed of. That's correct. In the same way that counsel here might have been informed of. Well, we — that could be true. It's possible they had the same source and it's possible they didn't have the same source, but it's kind of a problem, isn't it? Well, it might be, but that's — that's why counsel can't make this statement. I mean, he can't lead his client into believing that a life without parole sentence means that. Counsel did not state in this letter, anywhere in this letter, that life without parole means life without parole. You're not getting out unless you — the governor performs an act of grace, which is discretionary solely within the governor. That was not the tone of this letter, and that is the only type of advice that counsel could provide in this circumstance. And making matters worse is that Jones suffers with an intellectual disability. He was incapable of questioning this advice that was given to him. He was reliant upon counsel to give him honest and trustworthy advice, and said counsel misled him into believing that he would most likely be released. That is unreasonable. And I — Well, counsel didn't use those words. He used less than likely. If he said, I guarantee that you will get out, that's one thing. But the fact that you will live, you'll be in for life is less — less than likely is quite a different tone and quite a different promise. Well, he — he didn't say, I give you 100 percent guarantee. That's true. But he did say most likely, which means to an average person, including somebody who is intellectually disabled, oh, most likely, it must be I'm getting out. And I see he also wrote 15 to 18 years. That leaps out. I think that anybody in that situation would believe that life without parole means that, oh, I'm going to be getting out. Counsel, you cited the Nevada Supreme Court and the Miller decision as telling us that life without is not going to get — is not likely to get parole. Should counsel have cited that case? In his letter? Yeah. It came out afterwards. Okay. So how could counsel then possibly have known that? If they are relying on the same statistics, then counsel should be able to — I'm looking at Miller. This came out nine years later. And I'm looking at a paragraph that suggests that we conclude that the statistics cited above demonstrate that the possibility of commutation for at least some first-degree murderers is real rather than merely theoretical or speculative or attenuated. That was written in 1996. Absolutely, Your Honor. And I think that — That's fairly optimistic. That is. But in the paragraph before that, they describe it as real, albeit rare. And I think that that is really the point here, is that the most that counsel could have said here is that it's a real possibility. You know, life without parole, you're going to be spending the rest of your life in prison. However, the governor could — there's a real possibility the governor could commute your sentence, but that's discretionary, up to the governor, and you'll have to go before the pardons board, and hopefully that will happen someday. The nature of the crime here is, one, I mean, all murders are bad. He's clearly been convicted of a murder that is a first-degree murder, assuming that he was not too drunk. I mean, I get all of those things. But we see really horrible murders, and this is not one of them. He doesn't put this into the letter, but it seems to me likely that went into his How do you respond to that? I think it's possible. I mean, I think that there's lots of factors as to why Mr. Jones could have potentially someday gone before the pardons board. I think all of that is fair. He puts some in, doesn't put them all in. But the question comes down to whether or not it's misleading that he says it's most likely that your sentence will get commuted someday. And I just don't think that defense counsel was in a position to know that. It's simply unknowable, and it's something he crossed the line by saying. And I just think it's a misleading comment. It goes beyond just convincing. It's misleading. And how do we judge this in terms of, is this a Strickland standard of harmlessness? Is that the standard by which we review this one? Well, we submit that the proper standard would be the Hill standard, meaning that the But that's whether or not you plead. Yes. And so why do you get the plead standard rather than the Strickland standard? Well, what happened here is the equivalent of a guilty plea. The United States Supreme Court has described a capital sentencing hearing as sufficiently like a trial. In Nevada, the capital sentencing is considered one part of a bifurcated trial. The same constitutional rights apply at both, meaning the right to a jury trial. No, but realistically, as a practical matter, what's happening here is we're fighting over the sentence. The evidence of guilt of the actual underlying crime is overwhelming and disputable. I mean, if he goes to trial again, he's going to get convicted. I mean, that's just, you just know that. So what's at issue here is not a determination of guilt or innocence. He's not going to, does not have done a, whether I plead guilty to having done it or not. It's a lay down the hand sort of conviction. Right. We're really talking only about punishment. That's correct. But what So that brings me back to Strickland. Well, the Hill standard is looking at, you know, whether or not the defendant would have chosen to go to trial as opposed to if absent deficient performance. Here it's the exact same thing, meaning that what he was waiving here was equivalent to waiving a jury trial. Same constitutional rights. The facts of this particular situation demonstrate that. There were negotiations. There was a deal. There was a full colloquy about voluntariness during which the Court reviewed the same constitutional rights it does when it asks to see whether a guilty plea is voluntary. And what is so interesting to me is that, logically, this should be the right prejudice standard because we're using Hill deficient performance cases to determine whether or not counsel was deficient. So if we're using guilty plea cases to determine whether or not counsel was deficient, it should be the same on the prejudice component as well. And under the Hill standard, Jones can easily show prejudice. The letter itself shows that Jones was unwilling to consider a life without sentence. It wasn't until he received this misleading advice that he would most likely be released, that he changed his mind. He could have gotten the death penalty. He could have. And if he'd gotten the death penalty, we'd be right back up here on habeas, wouldn't we, for not having advised him to take life without parole? Maybe. But in the end, it was Jones' ---- Sotomayor, more than maybe. Now, what the answer we would give is a maybe, but you'd be here. Yes. We would be here. That's a fair statement. I apologize. It is a fair statement because nobody no attorney wants to see his decision make a make a see his client make a bad decision that can end up getting him the death penalty. I mean, I certainly wouldn't. But it was Mr. Jones' decision to make. And we know from the letter that he just refused anything other than life with. That's what he wanted. And I guess he was we don't know. Maybe we should be remanded for a hearing to find out what his reasoning actually was. But it could have been that he would rather get sentenced to death than spend 50 years in prison. But whatever his bad thinking was, it was his decision. Counsel still had the obligation to give him accurate and trustworthy and competent advice. And I think counsel crossed the line here. Okay. Why don't we save some time. Let's hear from the other side. Okay. Thank you. Good morning, Your Honors. Heidi Stern on behalf of respondents. Counsel was not deficient in this case in advising a stipulated sentence for Mr. Jones in order for him to avoid the very strong likelihood that he would receive the death penalty in his second penalty hearing. At most, as the district court correctly found, counsel's letter was a bit overly optimistic with regard to the issue of whether he would eventually get out of prison. However, that's not what this court that's not all this court requires. This court requires in order to find deficiency that counsel made a gross mischaracterization. And in this letter, as you read it, as Judge Bybee pointed out, it's a careful letter. It makes no promises. It makes no promises regarding the board. In fact, it specifically says that we can't predict what the board will do. He also says in this letter that you can't rely on the average of 13 to 18 years. It's also correct about the likelihood at the time whether the amendment to the Constitution will apply to Mr. Jones. So the counsel in this letter basically laid out a bunch of correct information. And as the bottom line, and indeed it's literally the bottom line, it is literally the last sentence, says most likely you're going to get out. Yes. And I would agree with the district court that's overly optimistic, but is it a gross mischaracterization? I would submit that within the context of this letter and how carefully it was written, it was not grossly mischaracterized. And in addition, I would ---- So it's possible that counsel overstated this in order to persuade his client to take the plea because he knew that he might be resistant to it and he was worried that he might otherwise get the death penalty? I think that is possible in theory, but not in fact. I think if this Court looks at the Miller case and also if this Court looks at the 2004 Attorney General opinion that's cited in our brief, that Miller case and the AG opinion talk about the way that these sentences were handled in Nevada in the 70s, these life without parole cases. And specifically in the Attorney General's report, it cites a case where someone with a life without parole sentence for first-degree murder got out in 13 years. And that is what that, in addition to other cases like that, is what led the legislature to amend the statute and the Constitution in 1982. So at the time that counsel was writing this letter, I don't think he needed to exaggerate by saying it was most likely, because at that time it actually was. So that covers gross mischaracterization, but this Court also requires an error in the advice regarding the outcome of the proceeding, and certainly that does not exist here. Counsel laid out correctly that there were three possible sentences at the penalty hearing, life with parole, life without parole, and the death penalty. Despite the Supreme Court's positive comments about the death penalty being a sort of a strange penalty here, counsel analyzes that in one of the first paragraphs and says it's still on the table. If the Supreme Court had wanted to withdraw that as a possibility, it would have. There's the issue of the fact that the second penalty hearing was not going to differ substantially from the first in which Mr. Jones was sentenced to death. The only other mitigating factors that were proposed to be presented at that penalty hearing were just another letter from a prison official, of which Mr. Jones did have several in his first penalty hearing, and then the possibility that there would be testimony regarding one of his prior violent crimes. The problem with that is counsel at that defense counsel submitted to the court a declaration or an affidavit saying that that person wasn't actually going to come and testify, that he didn't want to be involved. So the mitigation evidence, and that's at the record at 9-11 in case you want to take a look at that, but the bottom line is this penalty hearing was going to be the same. There was no additional mitigation. So the possibility of the death penalty was very real. In addition, counsel gave correct advice regarding what the outcome of the proceeding would be in saying that it was unlikely that Mr. Jones would receive life with parole. Let me pursue Judge Bybee's question with a little more bite to it. Let's assume you said it wasn't true, and maybe it's maybe or maybe not as true. But let's assume that the trial lawyer, his defense lawyer, is very concerned about the possibility of a death penalty. He thinks that the wise decision given that possibility is to take the deal and get life without, and he's very concerned that his client won't do that and it will be against his own best interest, and he exaggerates, knowingly so. And he says it is most likely that you will get out, but he actually assesses the likelihood of getting out as, at best, 50-50. Is it ineffective assistance of counsel to exaggerate the likelihood of release in order to get your client to accept the deal? No. Because? Because of the requirement of gross mischaracterization, which is a higher bar. So you can mislead your client, get him to make a decision based on a misleading prediction, and that's not ineffective assistance of counsel? Well, I think there's a question of whether misleading and exaggeration are equivalent concepts. Well, no, they're different. And I'm asking you, is it ineffective assistance of counsel to mislead your client so that he makes a decision based on your misleading representation when, in your view, you, the As long as it was a substantial, a substantial misleading, then yes, I would agree that that could be ineffective assistance of counsel. I think a hopeful speculation is not. Maybe that But it wouldn't be a problem if counsel said, can't make any predictions as to whether you're going to get it or not, a little bit of uncertainty, percentage is probably running against you. Nevertheless, I strongly, strongly urge you to accept the life without parole. There would be, there's no gross mischaracterization there, and he can push him as hard as he wants, right? Yeah, I agree with that. And I think the difference to me, looking at those two examples, is that your example, Judge Bybee, includes, the statement is couched in this, well, we can't rely on it, it's not stated as a near certainty. It's couched in a bunch of language that, that tempers its misleading effect. And I have to point out that my question to you assumed a fact not in evidence. That is to say, for purposes of my question, I assumed that he knew his prediction was optimistic. Yes. Yeah, we don't know that. Correct. Yeah. So if I could just move on to, unless there's further questions on counsel's deficiency, I'd like to move on and talk a little bit about prejudice. And as this Court knows, the State's position here is that there's no reason to take this case out of the Strickland standard of prejudice. The Hill case really is meant to apply to a very specific type of situation in the guilty plea context where the defendant is giving up a lot more rights than Mr. Jones was giving up. And because of that, because of those rights that are being given up when a defendant enters a guilty plea, there's good reason to require a lower prejudice standard. But here that doesn't exist. And I would say with regard to Petitioner's argument that these are equivalent situations, the guilty plea and the penalty hearing, that superficially there are similarities, but as a matter of actual fact of what that defendant is foregoing, there's a huge difference, difference between being innocent and the difference of three possible very strong penalties, all of them. It's just a completely different situation. So Mr. Jones has not shown that he was prejudiced under the Strickland standard. He has to show that there's a reasonable probability that the outcome of the proceeding would have been different. And as we've discussed before with regard to the counsel's letter, life with the possibility of parole for Mr. Jones was not likely. There really wasn't a difference in the mitigation evidence. The aggravators were the same. And a previous jury had already imposed the death penalty based on that same information. In addition, and this is perhaps the most important thing, the death penalty was still on the table. Mr. Jones had to make this decision knowing that he had previously been sentenced to death, that the evidence was the same, he could be sentenced to death, and that his appeal to convictions would be very unlikely to be overturned the second time. And his decision to enter into this agreement, stipulated sentence to life without the possibility of parole, was imminently reasonable. And he, as he expressed to the judge in the penalty hearing itself, said he wanted this and he understood that he was potentially spending the rest of his life in prison. That's all I have, unless the Court has other questions. Roberts. Thank you. You have saved some time. Okay. Thank you, Your Honor. I just have three quick matters. Respondent mentioned that the deficient performance standard also requires some erroneous advice about the possible effects. Well, counsel's misleading advice did that as well. Without counsel's advice, the only way that Mr. Jones would be able to guarantee an opportunity to go before the parole board would be to go to the penalty hearing, get a sentence, get a sentence of life with parole. However, counsel told him, you don't need to do that. You don't need to go to the hearing anymore. We're getting you life without, and life without means most likely you're going to be released, so you don't need to go through the hearing. So it changed the calculus as to the possible outcomes here. And that so it does meet the standard of deficient performance. Now, if we were to apply the Strickland prejudice standard rather than Hill, so assume Strickland, do you lose, is to say the outcome that he faced was death, life without, or life with. In order for you to win, you've got to show a sufficient probability that he would have received life with, which is the only better possibility on the table. Right. And I think we can show that here. The Nevada Supreme Court's decision was strong. It said that this is not a situation where the death penalty is – should be imposed. They went through the history. They said that, as Your Honor said before, this isn't one of the worst cases. And Mr. Jones had a significant amount of compelling mitigation – mitigating evidence. He had his intellectual disability. He has the – On the other hand, when the Supreme Court of Nevada said this is not your normal death penalty case, it didn't reverse it on the ground that this is not a case that's not – not a crime deserving of it. No, it's because there was the erroneous instruction. Right. And – but they did say that they remanded it because it was reasonable to conclude that a jury that was untainted by constitutional error would – may reach a different conclusion. And so that's why I think we can't put much stock in the original – what the original jury did, because their decision-making was affected by constitutional error. And so when you have an untainted jury looking at the facts of this case, looking at the mitigating evidence, which include the extreme racial intolerance down in Mississippi, the fact that the police set him – set him on fire, and he didn't start committing crimes until after he was set on fire by the police, and then he also had some extenuating circumstances with respect to some of the – some of the crimes that occurred afterwards, I think a jury untainted by the constitutional error would look at the mitigating evidence, would see the facts, and would – there's a reasonable probability that they would come to a life-with-parole sentence. Thank you, Your Honor. Thank you. Thank both sides for your helpful arguments. Jones v. Palmer submitted for decision. And that completes our argument calendar for this morning.
judges: D.W. Nelson, W. Fletcher, Bybee